IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GLORIA TREVIÑO and <br> JULIO TREVIÑO, <br>    Plaintiffs, <br><br> v. <br><br> ELLIS COUNTY TEXAS, et al., <br>    Defendants. | § <br> § <br> § <br> § <br> §    Civil Action No. 3:14-CV-3795-M-BK <br> § <br> § <br> § |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to the District Judge's *Standing Order of Reference*, Doc. 12, this cause is before the undersigned for a recommendation on Defendants' summary judgment motions. Doc. 72; Doc. 75. For the reasons that follow, it is recommended that the motions be **GRANTED**.

**I. FACTS**

In their Third Amended Complaint, Plaintiffs Gloria Treviño and Julio Treviño collectively "Plaintiffs"), as heirs of decedent Juan Treviño ("Treviño"), sued Ellis County ("the County") and various individuals associated with the Ellis County Jail ("the Jail"), pursuant to 42 U.S.C. § 1983, for violations of Treviño's constitutional right to adequate medical care.[1] Doc. 56 at 1. Plaintiffs named as defendants the County; Johnny Brown, the County Sheriff; Harry Ogden, the jail administrator; and Dr. William Fortner, the contract physician for the Jail (collectively "Defendants"). Doc. 56 at 2-3. Plaintiffs' claims stem from Defendants' alleged failure to ensure Treviño's proper treatment for several serious medical conditions, which they contend ultimately resulted in his death. Doc. 56 at 3-6.

Plaintiffs allege that when Treviño arrived at the Jail in October 2011, he had serious

---

[1] Plaintiffs repeatedly cite to section 1983 as "28 U.S.C. § 1983." The Court assumes that they meant to refer to Title 42.

medical issues, which worsened over the next 11 months, including chronic hidradenitis, type 2 diabetes, jaundice, extreme weight loss, openly bleeding lesions, and renal "insuffering," which Dr. Fortner later clarified to mean "insufficiency." Doc. 56 at 5, 15-17; Doc. 87 at 50 (Dr. Fortner Depo). On September 6, 2012, Dr. Fortner wrote a letter addressed to Ogden, detailing that Treviño had been hospitalized several times, had two blood transfusions, and had multiple medical problems. Doc. 56 at 5; Doc. 56 at 17 (letter attached to complaint). Dr. Fortner further informed Ogden that Treviño had lost 27 pounds in less than a year, had lost eight pounds in the prior two days, and weighed only 103 pounds. Doc. 56 at 5, 17. In closing, Dr. Fortner stated that "[i]t looks like he will soon need to be hospitalized again due to worsening of his anemia and severe weight loss. I think he is probably dying." Doc. 56 at 5, 17.

Plaintiffs aver that the day after being advised of this letter, Brown and Ogden obtained a bond and release order from the district court. Doc. 56 at 6-7. The day after that, Brown and Ogden allegedly had Treviño transferred to the Nueces County jail, located hundreds of miles away, based on outstanding warrants that they had known about for his entire period of incarceration at the Jail. Doc. 56 at 6-8. Shortly after arriving at the Nueces County jail, Treviño was taken to a hospital and placed in intensive care. Doc. 56 at 9. Plaintiffs attest that when the medical care at the hospital proved insufficient, Nueces County released Treviño to one of his sisters who took him to her home where he died shortly thereafter. Doc. 56 at 9. Defendants now move for summary judgment. Doc. 72; Doc. 75.

## II.    APPLICABLE LAW

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Section 1983 and Qualified Immunity

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To prove a claim under section 1983, Plaintiff must prove that (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) Defendant was acting under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry involves two prongs that the Court must answer affirmatively before an official is subject to liability: (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right and (2) whether the right

at issue was "clearly established" at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. A court may begin its assessment with either prong. *Id.* at 236 (*overruling in part Saucier v. Katz*, 533 U.S. 194 (2001)).

### C. Constitutional Right to Medical Care

The state's exercise of its power to hold detainees and prisoners brings with it a constitutional responsibility to tend to the essentials of their well-being, including by providing for their medical needs.[2] *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). Prison inmates derive their right to have these basic needs met from the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* As such, an inmate has a clearly established constitutional right not to be denied, by deliberate indifference, attention to his serious medical needs. *Id.* at 650. Pretrial detainees derive their right to be free from cruel and unusual punishment from the Fourteenth Amendment, and the same deliberate indifference standard applies. *Id.* at 639, 647-48.

Deliberate indifference to the serious medical needs of a prisoner constitutes an "unnecessary and wanton infliction of pain," proscribed by the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A cause of action for deliberate indifference to an inmate's medical needs may be maintained if there is a delay in access to medical care that results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Deliberate indifference also can be shown by proving that jail officials refused to treat the inmate, ignored his complaints, or intentionally treated him incorrectly. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A prison medical official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Id.*

---

2 It is not clear from the record in this case whether Treviño was a pretrial detainee or an inmate. Regardless, the same legal standard applies as noted. *Hare*, 74 F.3d at 639.

(citation, alteration, and internal quotation marks omitted). "Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997).

Conversely, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001). The "question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment" and is not actionable under section 1983. *Estelle*, 429 U.S. at 107. "At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act." *Id.*

Under the "deliberate indifference" standard, a plaintiff also must establish that the defendants acted with subjective deliberate indifference to his need for medical care. *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). To show that level of indifference, a plaintiff must present evidence that: (1) the defendant had "subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn"; (2) the defendant actually drew that inference; and (3) the defendant's response to the risk indicates that he subjectively intended that the harm occur. *Id.* (quotation marks omitted). Deliberate indifference thus requires actual knowledge and conscious disregard of the risk of harm to the plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### D.  Municipal Liability

A municipality does not automatically incur section 1983 liability for injuries caused solely by its employees, and it cannot be held liable under section 1983 on a *respondeat superior* theory. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691, 694 (1978); *Johnson v. Deep East Tex. Reg'l Narcotics*, 379 F.3d 293, 308 (5th Cir. 2004). Moreover, a

municipality is almost never liable for an isolated unconstitutional act on the part of an employee. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Rather, to establish municipal liability under section 1983 requires the existence of: (1) a policymaker; (2) a policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Monell*, 436 U.S. at 694.

Actual or constructive knowledge of the unconstitutional custom must be attributable to the governing body or to an official to whom policymaking authority has been delegated. *Johnson*, 379 F.3d at 309. A policy or custom can be either (1) a policy statement or rule that is officially promulgated by the county's lawmaking officers or a delegated official; or (2) a persistent, widespread practice of county officials or employees, which is so common and well settled as to constitute a custom that fairly represents county policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984). In describing the term "custom," the Supreme Court has used such phrases as "persistent and widespread . . . practices," "systematic maladministration" of the laws, practices that are "permanent and well settled," and "deeply embedded traditional ways of carrying out . . . policy." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970). To show that the policy at issue was the moving force behind the constitutional violations, Plaintiff must show a direct causal link between the policy and the violations. *Piotrowski*, 237 F.3d at 580; *see also Johnson*, 379 F.3d at 310 (there "must be more than a mere 'but for' coupling between cause and effect"; the policy "must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of).

Finally, a plaintiff must show either (1) that the policy itself violated federal law or authorized the deprivation of federal rights; or (2) "that the policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious

consequences. . . . A showing of simple or even heightened negligence will not suffice." *Johnson*, 379 F.3d at 309 (quotation omitted). The latter showing "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

### III.   ARGUMENTS AND ANALYSIS

#### *A. Dr. William Fortner*[3]

Dr. Fortner argues that Plaintiffs do not specifically allege any particular failure in his treatment of Treviño and, even if there were additional tests or treatments that could have been done, the failure to do so does not itself give rise to a constitutional violation, but rather is a matter of medical judgment. Doc. 73 at 15. Additionally, Dr. Fortner asserts that he is entitled to qualified immunity. He contends that he acts as a state employee via a contract between the Jail and a healthcare services company. Doc. 73 at 16-17. In his capacity as a state actor, Dr. Fortner maintains that his decisions regarding Treviño's care were objectively reasonable. Doc. 73 at 17.

In response to Dr. Fortner's summary judgment motion, Plaintiffs argue that Dr. Fortner should have attempted to have Treviño treated at the hospital rather than acquiescing to the other Defendants' decision to transfer Treviño to officials in Nueces County. Doc. 84 at 9, 19. Plaintiffs also assert that Dr. Fortner's failure to "follow up" to see if his concerns were being responded to and Treviño was getting the necessary treatment constituted deliberate indifference to Treviño's medical needs. Doc. 84 at 10, 17-18, 22-23, 25. Finally, Plaintiffs contend that even though Dr. Fortner knew that Treviño was in the Jail infirmary more often than not, his

---

[3] Plaintiffs filed in their appendix an email from a nurse at the Jail to Brearley. Dr. Fortner objects on the grounds of hearsay and moves to strike the document from the record. Doc. 88 at 2. The Court did not consider the email in making the recommendation in this case, as it would not change the analysis or conclusion; thus, there is no need to strike it.

deposition testimony revealed that he was indifferent to the seriousness of Treviño's condition and did not even know how many times Treviño had been hospitalized. Doc. 84 at 13-15.

A review of the evidence offered in the parties' summary judgment appendices reveals the following: On October 26, 2011, Treviño was incarcerated at the Jail, which contracted with Correctional Healthcare Management, Inc. ("CHM") to provide healthcare services to its inmates. Doc. 74-11 at 4 (CHM screening form); Doc. 74-11 at 13-14 (Brearley Depo). At that time, Dr. Fortner was under contract with CHM to provide medical services to state prison inmates, including Treviño. Doc. 74-12 at 4-5 (Fortner Depo).

The first day of his incarceration, Treviño underwent an initial health screening where he complained of "bleeding from [the] stomach," but on examination no bleeding was observed. Doc. 74-11 at 4-5 (Med. Recs.). The next day, Dr. Fortner examined Treviño and noted chronic appearing lesions on his scrotum that were draining pus and blood. Doc. 74-10 at 22; Doc. 74-12 at 23 (Med. Recs.). Dr. Fortner diagnosed Treviño with hydradenitis suppurativa and prescribed antibiotics.[4] Doc. 74-10 at 22; Doc. 74-12 at 23 (Med. Recs.).

During his 11-month incarceration at the Jail, Treviño saw Dr. Fortner or a nurse for this condition and saw other healthcare professionals repeatedly. Doc. 74-1 at 12, 20; Doc. 74-2 at 4, 9-10, 24, 27; Doc. 74-3 at 13-14; Doc. 74-5 at 13, 21, 26, 30; Doc. 74-6 at 6, 8, 15; Doc. 74-7 at 1-2, 6, 8, 12; Doc. 74-8 at 17-19; Doc. 74-9 at 18-19; Doc. 74-10 at 1-4, 6, 8; Doc. 74-10 at 10-15; Doc. 74-10 at 18-19, 21, 23 (Med. Recs.). As a result of his evaluations, Dr. Fortner issued treatment orders, prescribed medication, obtained outside consultations from medical specialists,

---

[4] Hydradenitis suppurativa is chronic suppurative folliculitis of sweat gland-bearing skin of the perianal, axillary, and genital areas, producing abscesses or sinuses with scarring. *Stedman's Med. Dictionary* 409700 (Nov. 2014). This definition is outside the record and was not considered in determining the merits of the motions *sub judice*, but is included to aid the reader's understanding only.

8

ordered and monitored Treviño's laboratory results, and requested diagnostic testing. Doc. 74-1 at 17-18; Doc. 74-2 at 5, 7-8; Doc. 74-2 at 19-20, 23, 26-28, 30; Doc. 74-3 at 12, 14, 22; Doc. 74-4 at 6, 8-12; Doc. 74-4 at 26, 28; Doc. 74-5 at 5, 7, 9, 14; Doc. 74-6 at 2-3, 5; Doc. 74-6 at 17; Doc. 74-6 at 29-30; Doc. 74-7 at 3-4, 13, 16-18; Doc. 74-7 at 27; Doc. 74-8 at 1, 6; Doc. 74-9 at 1-5, 10; Doc. 74-9 at 20; Doc. 74-10 at 1; Doc. 74-10 at 22 (Med. Recs.). During the relevant time period, Treviño was taken to the hospital for medical treatment three times. Doc. 74-2 at 11-13, 16; Doc. 74-5 at 5; Doc. 74-6 at 18-22; Doc. 74-7 at 1 (Med. Recs.).

On September 4, 2012, Dr. Fortner examined Treviño, noting that he was suffering from anemia, diabetes, hypertension, renal insufficiency, and liver disease, and he was unable to eat much due to nausea and vomiting. Doc. 74-1 at 14, 19; Doc. 74-10 (Med. Recs.). At the time, Dr. Fortner believed that Treviño was terminally ill. Doc. 74-1 at 14 (Med. Recs.); Doc. 74-12 at 11 (Fortner Depo). On September 6, 2012, Dr. Fortner wrote a letter to Ogden advising him that Treviño was very ill, was probably dying, and he would soon need to be hospitalized again due to his worsening anemia and severe weight loss. Doc. 74-1 at 13 (Med. Recs). Dr. Fortner testified that he wrote the letter because he felt that Treviño was going to die within the next few days and he preferred that Treviño be released to his family because he would be better off with them than in jail. Doc. 74-12 at 6-7 (Fortner Depo).

After he wrote the letter to Ogden, Dr. Fortner took no further action in regard to Treviño except to later ask a nurse what had happened to him. Doc. 74-12 at 8-9 (Fortner Depo). Dr. Fortner was not consulted about Treviño's transfer to Nueces County and had no personal knowledge of what happened to Treviño after his release from the Jail. Doc. 77-9 at 8-9, 13-14 (Fortner Depo). However, he testified that the Jail officials' attempt to have Treviño released so he could spend his last days with his family was consistent with his intent in writing the letter.

Doc. 77-9 at 11 (Fortner Depo).  After his transfer to Nueces County jail, Treviño was hospitalized twice more before he was released to the care of his family.  Doc. 77-16 at 1-6 (Med. Recs.).  On October 22, 2012, Treviño died at home from Non-Hodgkins lymphoma, with the contributing conditions of cirrhosis of the liver and diabetes mellitus.  Doc. 77-16 at 2-3 (Med. Recs.); Doc. 77-17 at 1 (Death Cert.).

      The Court finds no merit to Plaintiffs' argument that Dr. Fortner violated Treviño's Eighth Amendment rights by acquiescing to the Jail officials' transfer of him, as opposed to ordering that he be hospitalized.  Doc. 84 at 9, 19.  On these facts, it cannot be said that Dr. Fortner's decision – if indeed the decision was even up to him – was made with the intent to cause "unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  *Stewart*, 174 F.3d at 534.  As is clear from the record, Dr. Fortner extensively treated Treviño for his numerous and unfortunate maladies.  Moreover, the letter Dr. Fortner wrote on Treviño's behalf was an action he had undertaken only once before on behalf of another inmate, a suicidal 17-year-old.  Doc. 87 at 48.  The letter itself demonstrates the absence of indifference.

      There is no evidence that suggests Dr. Fortner intended any harm to Treviño during the relevant time frame, let alone that he was deliberately indifferent to Treviño's needs.  *Hare*, 74 F.3d at 650.  Indeed, the determination of whether to order other or additional treatment for Treviño was "a classic example of a matter for medical judgment."  *Estelle*, 429 U.S. at 107.

      In a similar argument, Plaintiffs paint Dr. Fortner's failure to "follow up" as abandonment of his patient.  Doc. 84 at 10, 17-18, 22-23, 25.  Not surprisingly, Plaintiffs offer no legal authority for the novel proposition that a doctor owes a patient a legal duty even after the patient is no longer in his or her care.  Such notion is counterintuitive.  The uncontroverted evidence is that Dr. Fortner made his final assessment of Treviño shortly before Treviño was

released from the Jail and taken to Nueces County. And there is no evidence to suggest that Dr. Fortner's alleged "inaction" showed a subjective intent to cause Treviño harm. *Brown*, 663 F.3d at 249.

Plaintiffs' final argument also finds no support in the evidence. Dr. Fortner's supposedly indifferent testimony was in response to a hypothetical question about whether he would be concerned if an inmate had to see a nurse every day. Doc. 84 at 13. In the next exchange, however, Dr. Fortner indicates that he would consider a patient's need to be seen only by a nurse as an issue that would be within the nurse's purview. Doc. 87 at 50. This does not demonstrate that Dr. Fortner had actual knowledge of and conscious disregard for a risk of harm to Treviño. *Farmer*, 511 U.S. at 834. Finally, Dr. Fortner cannot be found liable for violating Treviño's constitutional rights simply because, after more than three years since treating Treviño, Dr. Fortner could not remember how many times Treviño had been hospitalized. Doc. 84 at 13-15.

In sum, when the evidence is viewed as a whole and in the light most favorable to Plaintiffs, it conclusively establishes that Dr. Fortner did not act with subjective deliberate indifference to Treviño's need for medical care or otherwise behave with a wanton disregard for Treviño's medical needs. *Brown*, 663 F.3d at 249; *Domino*, 239 F.3d at 756. Stated differently, there is no genuine issue of material fact as to that issue. Accordingly, Dr. Fortner's summary judgment motion should be **GRANTED**.

### B. Ellis County[5]

The County argues that Plaintiffs have not alleged and cannot establish that any County

---

[5] Plaintiffs objected to certain of Defendants' summary judgment evidence as hearsay, Doc. 86 at 7 n.3, and Defendants objected to the inclusion of documents in Plaintiffs' Appendix that were not produced in discovery, Doc. 89 at 1. Plaintiffs' objections are overruled because the documents constitute business records and medical records, which are both exceptions to the hearsay rule. FED. R. EVID. 803(4), (6). The Court did not consider Plaintiffs' newly produced documents in making a recommendation in this case.

custom, policy, or practice caused the deprivation of Treviño's constitutional rights or was a moving force behind his injury. Doc. 76 at 18-19. To the extent Plaintiffs argue that the County had a practice and custom of ignoring state law defining the required level of care, the County asserts that the claim fails as a matter of law. Doc. 76 at 19.

Plaintiffs respond that they adequately alleged a policy or practice in pleading that (1) the "County Jail doctor" told Treviño that "as soon as Treviño got out of jail he should see a doctor because he couldn't do anything because he worked for the sheriff's department"; (2) the County had demonstrated a "failure of medical care" in at least two other cases; (3) the County had a practice of ignoring the requirements of state law and the Jail's health plan; and (4) Brown had a policy of not "mak[ing] a call" regarding whether someone was dying and not consulting Dr. Fortner for a recommendation about the transfer. Doc. 56 at 4, 8-10, 12; Doc. 86 at 14, 18-19.

None of these alleged actions or inactions rises to the level of an official policy, custom, or practice sufficient to hold the County liable. The first and fourth alleged practices occurred only once which, on these facts, is insufficient to establish a pattern, practice, or custom. *Monell*, 436 U.S. at 691; *Piotrowski*, 237 F.3d at 578. With regard to the second alleged practice or custom, Plaintiffs have not demonstrated a sufficiently significant number of incidents of the County failing to provide sufficient medical care to show either an official rule or a "persistent, widespread practice" that constitutes a "deeply embedded" custom.[6] *Adickes*, 398 U.S. at 167-68; *Bennett*, 735 F.2d at 862. As to the third custom or practice, Plaintiffs provide virtually no

---

[6] In their Third Amended Complaint, Plaintiffs allege that "[t]here have been numerous prior incidents of 'failure of medical care' at the Ellis County Jail … and this indicates a pattern. Brown was a defendant in some of the cases." Doc. 56 at 4. Plaintiffs inexplicably fail to mention, however, that in the three cases of this Court that they cite in support, the plaintiffs' claims, including those against Brown, were ultimately dismissed. *See Lohman v. Ellis County Jail, et al.*, 3:12-CV-5285-P, Doc. 16; *Rogers v. Brown, et al.*, 3:12-CV- 2458-M, Doc. 72; *Moore v. State of Texas, et al.*, 3:11-CV-0749-M, Doc. 18.

factual basis for it. Doc. 56 at 9-10. There is no specificity as to the particular requirements that were ignored, who ignored which requirement, when, how often, and – most importantly − how the alleged failure to follow protocol was a moving force behind the alleged constitutional violations and directly linked thereto. Doc. 56 at 4 & Doc. 86 at 22 (both citing TEX. ADMIN. CODE Title 37, Part 9, Chapter 273, §§273.1, 273.2[7]); *Piotrowski*, 237 F.3d at 580. Finally, Plaintiffs have not made any showing that any of the alleged policies were adopted or maintained by County policymakers with deliberate indifference to their known or obvious consequences. *Johnson*, 379 F.3d at 309 (quotation omitted).

Putting aside the deficiencies in Plaintiffs' complaint, in the face of the County's argument that Plaintiffs cannot produce evidence of any official policy, custom or practice, Doc. 76 at 16, Plaintiffs offer none. "Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue." *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Id*. (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir.2007). Based on Plaintiffs' failure to offer any evidence whatsoever establishing a genuine issue of material fact as to the existence of a practice, custom or policy of the County's that resulted in the deprivation of Treviño's constitutional right and, ultimately, his death, the County's summary judgment motion should be **GRANTED**.

---

[7] Section 273.1 requires jails to provide medical, mental, and dental services in accordance with an approved health services plan. Section 273.2 requires jails to implement uniform procedures for the provision of such services.

### C. Brown and Ogden

Plaintiffs brought suit against Brown and Ogden in both their official and individual capacities.  Doc. 56 at 1.

#### 1. Official Capacity Claims

Brown and Ogden first argue that the official capacity claims against them should be dismissed because they are actually claims against the County.  Doc. 76 at 15-16.  Plaintiffs do not directly respond to this argument, but Brown and Ogden are correct.  Official capacity suits against government employees essentially represent another way of pleading an action against the entity of which the employee is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Consequently, as to the suit brought against them in their official capacities, Brown and Ogden's summary judgment motion should be **GRANTED**.  *See Sanders v. English*, 950 F.3d 1152, 1159 n.13 (5th Cir. 1992) (noting that a suit against city employees in their official capacities was tantamount to a suit against the city itself).

#### 2. Individual Capacity Claims

To the extent they are sued in their individual capacities, Brown and Ogden argue that they were not personally involved in the allegedly unconstitutional action of transferring Treviño to Nueces County, nor did they implement the allegedly unconstitutional policies that caused Treviño's injuries.  Doc. 76 at 20.  Brown and Ogden note that the decision to transfer Treviño was made by Chief Deputy Dennis Brearley who ran the day-to-day operations of the Sheriff's office.  Doc. 76 at 20-22.

Plaintiffs respond that Brown exhibited deliberate indifference insofar as he (1) is the "overall overseer" of the Jail; (2) was made aware of the transportation arranged for Treviño to go to Nueces County; (3) was aware of Dr. Fortner's letter, saw a copy of it, and had discussions

14

with Brearley about it; (4) knew that Brearley was contacting the district judge about the personal recognizance bond for Treviño; (5) was aware of Treviño's extremely serious medical condition; and (6) let Treviño be sent to Nueces County without asking Dr. Fortner what his recommendation was. Doc. 86 at 15-16, 19-21.

As to Ogden, Plaintiffs contend that he was the jail administrator and had acknowledged that he was responsible for making sure the Jail's health care plan was being carried out correctly and for managing the health care contract. Doc. 86 at 22-24. Additionally, Plaintiffs observe that Ogden took Dr. Fortner's letter to Brearley, yet Ogden did not ask Dr. Fortner for any guidance despite knowing of Treviño's serious condition. Doc. 86 at 23-24.

A review of the evidence in the parties' summary judgment appendices reveals the following: Dr. Fortner addressed his letter to Ogden who took it to Brearley. Doc. 77-9 at 13-14 (Fortner Depo); Doc. 77-10 at 2 (Ogden Depo). Brearley decided to take action to have Treviño released to his family because he had compassion for the family whom he had known for years. Doc. 77-8 at 6-7, 17 (Brearley Depo). Treviño was in the Jail on a $5,000.00 bond, but he never posted the bond. Doc. 87 at 16 (Brown Depo). After receiving Dr. Fortner's letter, Brearley obtained a personal recognizance bond so the County could release its hold on Treviño. Doc. 87 at 17 (Brown Depo).

Prior to releasing Treviño, a criminal record check had to be run to see if there were any outstanding warrants. Doc. 87 at 17-18 (Brown Depo). In this case, there was a warrant in Nueces County for Treviño, so he could not be released without the permission of a Nueces County judge. Doc. 87 at 17-18 (Brown Depo). Brearley attempted to get the Nueces County judge to release the hold at which point the County would have released Treviño on the personal recognizance bond, but the Nueces County judge would not sign the bond. Doc. 77-8 at 8-9.

15

(Brearley Depo); Doc. 87 at 15-16, 18 (Brown Depo).  Brown testified that Brearley told him he was in the process of trying to get Treviño released and the steps he was taking, but Brown gave him no instructions because Brearley had the situation under control.  Doc. 77-1 at 3 (Brown Depo).  Ogden was not involved in the discussion of what action should be taken with regard to Dr. Fortner's letter nor was he involved in the decision to transfer him.  Doc. 77-10 at 3-4 (Ogden Depo).

It is clear from Plaintiffs' argument regarding Brown that they are attempting to hold him liable on the basis of his supervisory status as an "overseer" of his employees and his knowledge of various actions that were being taken on Treviño's behalf.  Under section 1983, however, supervisory officials cannot be sued for the actions of their subordinates based solely upon the theories of vicarious liability or *respondeat superior*.  *Reimer v. Smith*, 663 F. 2d 1316, 1323 (5th Cir. 1981).  Such officials may only be liable under section 1983 when they (1) are personally involved in depriving a plaintiff of his constitutional rights; or (2) institute an unconstitutional policy that causally results in such a deprivation.  *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).

In the instant case, Plaintiffs do not allege that Brown had any direct personal involvement in the decisions involving Treviño or that he implemented any unconstitutional policy causing it.  There is no evidence in the record to support either proposition.  The claim against Brown is impermissibly based on theories of vicarious liability and *respondeat superior*.  Consequently, it is without merit.

The claim against Ogden is equally baseless.  The evidence shows his only involvement in the events at issue was giving Dr. Fortner's letter to Brearely.  There is no evidence that he had anything to do with the decisions made concerning Treviño from that point forward.

Moreover, a suit cannot be maintained against him based on his role as the Jail administrator and manager of its health care contract because, again, liability on the basis of *respondeat superior* is not permissible. *Reimer*, 663 F. 2d at 1323. Finally, Plaintiffs can establish nothing unconstitutional in Ogden not asking Dr. Fortner for any guidance, as the letter specified Dr. Fortner's opinion.

### 3. Qualified Immunity

Finally, Plaintiffs did not respond to Brown and Ogden's argument they are entitled to qualified immunity. However, as noted above, to overcome Brown and Ogden's qualified immunity defense, Doc. 76 at 16-19, Plaintiffs would have to establish a constitutional violation and demonstrate that the right was clearly established at the time of Defendants' alleged misdeeds. *Pearson*, 555 U.S. at 232. As previously discussed herein, however, Plaintiffs have wholly failed to establish that either Brown or Ogden violated Treviño's right under the Constitution to receive adequate medical care while in custody.

Based on all of the foregoing, it is recommended that, as to the suit brought against them in their individual capacities, Brown and Ogden's summary judgment motion be **GRANTED.**

## IV. CONCLUSION

For the foregoing reasons, it is recommended that Defendants' summary judgment motions, Doc. 72 & Doc. 75, be **GRANTED**, Plaintiff's Third Amended Complaint be **DISMISSED WITH PREJUDICE**, and this case be **CLOSED**.

**SO RECOMMENDED** on August 25, 2016.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE